Darrell L. Olson (Bar No. 77633)
darrell.olson@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Suite 1400
Irvine, CA 92614
Telephone: 949-760-0404
Facsimile: 949-760-9502

Timothy J. Goodson (Bar No. 244649)
timothy.goodson@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
333 Bush Street, 21st Floor
San Francisco, CA 94104
Telephone: 415-954-4114
Facsimile: 415-954-4111

Attorneys for Defendant/Counterclaimant
SPECIALIZED BICYCLE COMPONENTS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ICON-IP PTY, LTD., <br><br> Plaintiff/Counterdefendant, <br><br> v. <br><br> SPECIALIZED BICYCLE COMPONENTS, INC., <br><br> Defendant/Counterclaimant. | Case No. CV-12-3844 JST <br><br> **DEFENDANT SPECIALIZED BICYCLE COMPONENTS, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** <br><br> Date: Oct. 8, 2013 <br> Time: 2:00 p.m. <br> Ctrm: 9 <br><br> Hon. Jon S. Tigar |

**TABLE OF CONTENTS**

**Page No.**

I.   THE '180 PATENT ....................................................................................1

   A.   Background of the '180 Patent .........................................................1

   B.   The Hinge Terms ..............................................................................1

      1.   Construction of the Hinge Terms Is Needed ...........................2

      2.   The '180 Patent Uniformly and Exclusively Describes
           Hinged Saddles as Having the Characteristics in
           Specialized's Construction ......................................................3

         a.   A Construction Should Comport with How the
              Invention Is Repeatedly, Consistently Described in
              the Specification ...........................................................3

         b.   Overview of the Hinged Bicycle Seats Described in
              the '180 Patent ..............................................................4

         c.   Hinges Are Specific, Localized Regions ......................6

         d.   Flexing of the Hinges During Pedaling Allows Each
              of the Support Portions to Independently Rotate in
              an Arc About the Hinge .................................................7

         e.   The Movement of the Support Portions Is Without
              Interference or Significant Dampening ........................8

         f.   The Nose Is Held Substantially Still While the
              Support Portions Rotate About the Hinges..................10

         g.   There Is No Hinge If the Support Portions Are Not
              Free to Rotate Without Interference or Significant
              Dampening While the Nose Is Held Substantially
              Still................................................................................10

      3.   Specialized's Construction Avoids the Mythos Prior Art;
           Icon's Does Not ....................................................................11

      4.   In Prosecuting Foreign Counterpart Patents, the Patentee
           Distinguished Saddles with Rigid Rails Fixed to the Rear
           Support Portions ...................................................................13

Specialized's Claim Construction Brief
                               Case No. CV 12-3844 JST

# TABLE OF CONTENTS
### (continued)

Page No.

a.   The Patentee Distinguished Saddles with Rigid Rails Fixed to the Support Portions in Prosecuting the Taiwanese Counterpart ...................14

b.   In the Korean Counterpart, the Patentee Again Distinguished Saddles with Rigid Rails Fixed to the Support Portions ..........................15

5.   The Licensing of the '180 Patent Supports Specialized's Construction...................................15

6.   Specialized's Construction, Not Icon's, Is Consistent with the Ordinary Meaning of a Hinge ...........................16

C.   The Stop Means Terms ...............................17

II.   THE '938 PATENT .........................................19

A.   Background of the '938 Patent ......................19

B.   The Permanently Transverse Term.................20

1.   Specialized's Construction Is Fully Supported by the Intrinsic Record ..............20

2.   Icon's Construction Eviscerates the Meaning of the Permanently Transverse Term.....................21

3.   Specialized's Construction Regarding the Orientation of the Abutment Means Is Easy to Understand and Apply, While Icon's Construction Is Confusing ...............23

C.   The Abutment Means Terms ........................23

III.   CONCLUSION..............................................25

# TABLE OF AUTHORITIES

**Page No(s).**

*ActiveVideo Networks, Inc. v. Verizon Communs. Inc.*,
  801 F. Supp. 2d 465 (E.D. Va. 2011) ...........................................................................13

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
  637 F.3d 1324 (Fed. Cir. 2011) .....................................................................................3

*Apple Computer, Inc. v. Articulate Sys., Inc.*,
  234 F.3d 14 (Fed. Cir. 2000) .......................................................................................11

*Apple, Inc. v. Motorola, Inc.*,
  2011 WL 10004441 (W.D. Wis. Oct. 13, 2011) ....................................................13, 14

*Bicon, Inc. v. Straumann Co.*,
  441 F. 3d 945 (Fed. Cir. 2006) ...............................................................................22, 24

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
  296 F.3d 1106 (Fed. Cir. 2002) ...................................................................................18

*Caterpillar Tractor Co. v. Berco, S.p.A.*,
  714 F.2d 1110 (Fed. Cir. 1983) ...................................................................................13

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*,
  412 F.3d 1291 (Fed. Cir. 2005) .......................................................................17, 18, 25

*Every Penny Counts, Inc. v. Am. Express Co.*,
  563 F.3d 1378 (Fed. Cir. 2009) .....................................................................................2

*Frolow v. Wilson Sporting Goods Co.*,
  710 F.3d 1303 (Fed. Cir. 2013) ...................................................................................15

*Group One, Ltd. v. Hallmark Cards, Inc.*,
  254 F.3d 1041 (Fed. Cir. 2001) ...................................................................................12

*Hologic, Inc. v. SenoRx, Inc.*,
  639 F.3d 1329 (Fed. Cir. 2011) .....................................................................................3

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
  383 F.3d 1295 (Fed. Cir. 2004) .....................................................................................3

*Laitram Corp. v. Rexnord, Inc.*,
  939 F.2d 1533 (Fed. Cir. 1991) ...................................................................................19

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) .....................................................................................2

**TABLE OF AUTHORITIES**
**(continued)**

Page No.

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................................................3

*Powdermagic, Ltd. v. Rossignol Ski Co.*,
  2005 WL 3981617 (D. Utah 2005) ...............................................................................12

*Power-One, Inc. v. Artesyn Techns., Inc.*,
  599 F.3d 1343 (Fed. Cir. 2010) ....................................................................................23

*Saffran v. Johnson & Johnson*,
  712 F.3d 549 (Fed. Cir. 2013) ................................................................................3, 18

*Southwall Technologies, Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995) ..............................................................................20, 21

*Stumbo v. Eastman Outdoors, Inc.*,
  508 F.3d 1358 (Fed. Cir. 2007) ............................................................................22, 24

*TriMed, Inc. v. Stryker Corp.*,
  514 F.3d 1256 (Fed. Cir. 2008) ....................................................................................24

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ........................................................................................3

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
  442 F.3d 1322 (Fed. Cir. 2006) ....................................................................................13

## I. THE '180 PATENT

**A.     Background of the '180 Patent**

The '180 patent describes a bicycle seat with a nose 18 and rear support portions 12, 14 that are coupled together by hinges 20, 22.  (Ex. B, 8:9–13.)  The patent explains that the "front portion 18 is held substantially still and the support portions 12 and 14 are able to move by flexing movement of hinges 20 and 22 relative to the front portion 18."  (*Id.* at 8:60–63.)  During pedaling, the movement of a rider's buttocks causes "general oscillating movement of the support portions 12 and 14 about hinges 20 and 22 independently of one another so that the portions 12 and 14 move in an arcuate manner as shown by arrow A in FIG. 2."  (*Id.* at 9:10–15.)  According to the patent, this arcuate movement enhances comfort for the rider and provides energy back to the rider during pedaling.  (*Id.* at 9:28–34.)



**B.     The Hinge Terms**

Specialized's construction of the hinge terms is the correct one because it accords with every embodiment of a hinged seat in the specification, all of which depict and describe hinges as specific, localized regions that flex during pedaling to allow the support portions to independently rotate without interference or significant dampening, while the nose is held substantially still.  While this intrinsic evidence is reason enough on its own to adopt Specialized's construction, the extrinsic evidence—including prior art to the '180 patent, prosecution of foreign counterpart patents, licensing history, and dictionary definitions—uniformly compels the same conclusion.

Specialized's construction properly avoids ensnaring within the claim scope the Mythos saddle, which is prior art to the '180 patent.  The Mythos's rigid rails are fixedly

-1-                          Specialized's Claim Construction Brief
Case No. CV 12-3844 JST

1   joined to the rear portions of the saddle, interfering with the rear portions' movement and

2   therefore excluding the Mythos from the scope of the '180 patent under Specialized's

3   construction of the hinge terms.  Specialized's construction also aligns with the patentee's

4   licensing of the '180 patent and the prosecution of foreign counterpart patents, both of which

5   show that before this litigation began, the patentee understood the invention as excluding

6   saddles in which rigid rails interfere with the movement of the rear support portions.

7   Specialized's construction is further supported by the general use dictionary that both parties

8   identified in the Joint Claim Construction Statement, which demonstrates that the ordinary

9   meaning of a hinge is a flexible device that allows pivoting of a part on a stationary frame.

10      Icon's construction is overly broad, both as a matter of plain meaning and as a matter

11  of patent law.  Contrary to Icon's construction, a hinge is not simply a flexible area that

12  allows flexing.  Trampolines, hammocks and tennis racquet heads all have flexible areas, but

13  do not have hinges.  Icon's overbroad construction also reads on the Mythos prior art saddle

14  and thereby renders the claims invalid.

15          1.      <u>**Construction of the Hinge Terms Is Needed**</u>

16      Icon's baseline position on the hinge terms is that the Court should not construe them,

17  but Icon and Specialized clearly have different views of what the hinge limitations require.

18  (Br. at 6–7).  When parties dispute the scope of patent claims, "the court, not the jury, must

19  resolve that dispute."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351,

20  1360 (Fed. Cir. 2008).  The court must resolve questions of claim scope even when they arise

21  from nontechnical phrases in common usage.  *See, e.g., O2 Micro*, 521 F.3d at 1360–61

22  (district court erred by not construing the phrase "only if" because applying the "ordinary

23  meaning" did not resolve the parties' dispute about claim scope, and that dispute could not be

24  left for the jury).  Because "the court must see to it that disputes concerning the scope of the

25  patent claims are fully resolved," construction of the hinge terms is needed.  *Every Penny*

26  *Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009).

27  / / /

28  / / /

2. **The '180 Patent Uniformly and Exclusively Describes Hinged Saddles as Having the Characteristics in Specialized's Construction**

    a. **A Construction Should Comport with How the Invention Is Repeatedly, Consistently Described in the Specification**

As Icon acknowledges, claims "must be read in view of the specification, of which they are a part." (Br. at 4 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).) The specification "is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). In *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324 (Fed. Cir. 2011), the Federal Circuit relied on description in the specification to construe "eccentric weight portion" to require structure extending from the face of the gear. The court rejected the patentee's argument that the specification's description was merely exemplary, noting that "the consistent reference throughout the specification" to these limitations made "it apparent that [the limitations] relate[d] to the invention as a whole, not just the preferred embodiment." *Id.* at 1333.

Similarly, in *Saffran v. Johnson & Johnson*, 712 F.3d 549 (Fed. Cir. 2013), the court construed "device" to require a continuous sheet due to "[e]xtensive, consistent usage in the specification" and noted that its construction, "rather than confining the term to a single embodiment, would accord with *every* embodiment and description presented in the . . . patent." *Id.* at 560 (emphasis added). *See also Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1303 (Fed. Cir. 2004) ("[W]hile the specification does not contain any statements of explicit disavowal or words of manifest exclusion, it repeatedly, consistently, and exclusively uses 'group' to denote fewer than all subscribers, manifesting the patentee's clear intent to so limit the term."). Here, "the specification, including the figures, consistently and exclusively shows" saddles in which the support portions rotate about the hinges without interference or significant dampening while the nose is held substantially still, and "that is clearly what the inventor[] . . . conceived of." *Hologic, Inc. v. SenoRx, Inc.*, 639 F.3d 1329, 1338 (Fed. Cir. 2011). As such, a construction of the hinge terms that includes these features "most naturally aligns with the patent's description of the invention." *Phillips*, 415 F.3d at 1316.

### b.    <u>Overview of the Hinged Bicycle Seats Described in the '180 Patent</u>

The figures and text of the '180 patent show seven different embodiments of hinged bicycle seats.  In every one, the hinge is a specific, localized region that flexes during pedaling to allow each of the support portions to independently rotate in an arc about the region without interference or significant dampening, while the nose/front portion is held substantially still.



In a first embodiment illustrated in Figures 1–6, "[t]he rail 40 is connected between the hinges 20 and 22 and front end 42 of the nose 18 so that the rail 40 is confined to the nose 18 and **does not interfere with movement** of the hinge 22 or support portions 12 and 14. Thus, when the rail 40 is coupled to a bicycle to secure the seat 10 to the bicycle (in a manner which is known) **the front portion 18 is held substantially still** and the support portions 12 and 14 are able to move by flexing movement of hinges 20 and 22 relative to the front portion 18."  (Ex. B, 8:54-63 (emphasis added).)



The second embodiment in Figures 7–8 has a truncated nose and thicker upholstery but otherwise "functions in exactly the same manner as that of FIGS. 1 to 6."  (*Id.* at 10:12–16.)



Similarly, the third embodiment in Figures 9–14 has other variations, but the patent teaches that the hinges "operate[] in precisely the same manner as in the embodiments of FIGS. 1 to 6."  (*Id.* at 10:32–34.)

In a fourth embodiment, shown in Figures 23–36, "[o]nce again an integral hinge is formed in the regions 20 and 22 between the support portions 12 and 14 and the nose 18 so that the support portions 12 and 14 can undergo independent arcuate movement . . . in the same manner as has been previously described."  (*Id.* at 11:35–42.)  Unlike the earlier embodiments, in which the rail is confined to the nose, the rail of the fourth embodiment

1     includes "rearwardly extending free end sections

2     145 which are spaced from the lower surface

3     [11b] of the shell." (*Id.* at 13:43–45.) When a

4     severely high load is applied to the support

5     portions, these free end sections will come into



6     contact with the lower surface, thereby preventing permanent distortion or breaking of the

7     seat. (*Id.* at 13:45–57.)

8        The fifth embodiment of Figures 37–40 "includes the internal hinge and the other

9     features previously described" although the figures show the shell "only schematically." (*Id.*

10     at 14:63–66.) However, the "mounting rail 40

11     is different to the previous embodiments in that

12     it extends further to the rear of the seat to a

13     position below the buttock portions 12 and 14."



14     (*Id.* at 15:1–3.) The patent teaches that "[t]he seat functions in the same manner as described

15     with reference to the embodiment of FIGS. 23-35 except that the springs 182 act to ***slightly***

16     ***dampen the movement of the support portions*** 12 and 14 and also facilitate return of the

17     support portions 12 and 14 during pedaling motion." (*Id.* at 15:13-17 (emphasis added).)

18        As to the sixth embodiment of Figures 41–42, which likewise appears to show the

19     shell only schematically, the specification

20     describes that "FIG. 41 shows a further

21     embodiment similar to FIG. 37 in which the

22     springs 182 are replaced by an integral spring



23     190 formed integral with the rail 40. The rail 40

24     may be formed from steel material and the curved portion of the rail 40 which forms the

25     spring 190 ***provides the same spring effect*** as the coil springs 182 previously described." (*Id.*

26     at 15:30–35 (emphasis added).)

27     / / /

28     / / /

In the tenth and final embodiment[1] of Figures 47–50, "[h]inge portions 246 are provided between the buttock support sections 242 and the horn section 244. . . . [T]he buttock support sections 242 will pivot about the spring material hinge 246 under the weight and/or pressure supplied by the user." (*Id.* at 17:11– 19.) "During pedaling motion, the portions 242 will therefore tend to move upwardly and downwardly as shown by arrows D and E in FIG. 50 . . . so that the portions 242 basically move in paddle like or seesaw like movement during pedalling motion by the user." (*Id.* at 17:36–42.)



### c.    Hinges Are Specific, Localized Regions

Throughout the specification, the hinges are described and depicted as discrete sections of the seat in specific, localized regions bounded by the nose on one side and the support portions on the other. The figures define the hinge areas not with an arrow pointing to general areas, but with boundary lines demarcating the hinges. (*See, e.g.,* hinges 20, 22 in Ex. B, Figs. 1–4, 7–12, 23.) Icon points to the description of the tenth embodiment to argue that the hinges need not be specific, localized regions (Br. at 9), but the cited excerpt is yet another example of the patent describing the hinge as a separately identifiable region "***defined by*** the transition areas between the buttock support section 242 and the horn section 244." (Ex. B, 17:20–23 (emphasis added).) Moreover, Figure 47, which illustrates the tenth embodiment, defines the hinge portions 246 within lined areas. The patent nowhere suggests that the hinges could overlap with or be part of the support portions or part of the nose. Rather, the hinge begins where the nose ends, and ends where a support portion begins. Indeed, Claim 1 itself states that the hinges are "between each of the first and second support

/ / /

---

[1] The seventh through ninth embodiments of Figures 43–46 relate to inflatable housings and car seats, not hinged bicycle seats.

portions and the front portion."  A hinge cannot meet this requirement unless it is its own separate region of the saddle.  Thus, the claimed hinges are properly understood as specific, localized regions.

Both parties agree that the hinges separate the support portions from the nose.  (Br. at 7.)  However, because the plastic shell described in the '180 patent is flexible across its entire length, under Icon's construction, virtually any portion along the length of the shell could qualify as a hinge because there is no clear definition of where the nose ends and where the support portions begin.  This does not comport with the defined area for the hinge shown in the figures and described in the text.  Specialized's construction properly requires that the hinge be a specific, localized region, not a nebulous area that exists wherever flexing occurs.

### d.   Flexing of the Hinges During Pedaling Allows Each of the Support Portions to Independently Rotate in an Arc About the Hinge

The patent repeatedly describes that "the support portions 12 and 14 are able to move by *flexing movement of hinges* 20 and 22."  (Ex. B, 8:61–62 (emphasis added).)  According to the specification, "the combined effect of the slot 16 and the transition from the nose portion 18 to the support portions 12 and 14 allows flexing movement of the support portions 12 and 14 *about the hinges* 20 and 22 relative to the front portion 18."  (*Id.* at 8:21-25 (emphasis added).)  During pedaling, the rider's buttocks cause movement of "the support portions 12 and 14 *about hinges* 20 and 22 independently of one another so that the portions 12 and 14 move *in an arcuate manner* as shown by arrow A in FIG. 2."  (*Id.* at 9:10–15 (emphasis added).)  The second, third, and fourth embodiments operate the same way and the support portions undergo the same independent arcuate movement.  (*Id.* at 10:12–16; 10:32–34; 11:35–42.)  The fifth and sixth embodiments "function in the same manner" and the specification does not describe a different movement pattern of the support portions for these embodiments.  (*Id.* at 15:13-17.)  In the tenth embodiment, "buttock support sections 242 will pivot *about the spring material hinge* 246," and the arrows in Figures 48 and 50 show the same arcuate movement pattern as the other embodiments.  (*Id.* at 17:11–19.)  Thus, in every hinged seat described in the specification, flexing of the hinges during pedaling allows each

-7-                Specialized's Claim Construction Brief
Case No. CV 12-3844 JST

1   of the support portions to independently rotate in an arc about the hinge.

2          The specification teaches that the movement of the support portions can vary, but it is

3   always described as arcuate.  The specification teaches that generally, the arcuate movement

4   is "mainly in a substantially vertical plane which is parallel to the longitudinal axis of the

5   bicycle" (*Id.* at 9:15–17) whereas arcuate movement in the plane perpendicular to the axis of

6   the bicycle is a "minor component."  (*Id.* at 9:23–25.)  The specification also teaches

7   alternatives for recreational use in which the arcuate movement is "in a more lateral direction

8   in a plane transverse with respect to the longitudinal axis of the seat and bicycle." (*Id.* at

9   14:17–19.  *See also id.* at 14:25–29.)  Importantly, however, in all cases the movement is

10  described as "arcuate."  Thus, although Icon correctly points out that Claim 14, unlike Claims

11  1 and 12, does not use the term "arcuate" (Br. at 11), there is no support in the specification

12  for the movement to be anything other than in an arc about the hinge.  Accordingly, the

13  construction for all three claims should recite that the movement is in an arc about the hinge.

14          **e.          The Movement of the Support Portions Is Without Interference or**

15                         **Significant Dampening**

16          In the first embodiment, "the rail 40 is confined to the nose 18 and ***does not interfere***

17  ***with movement*** of the hinge 22 or support portions 12 and 14."  (8:56–58 (emphasis added).)

18  The same is true for the second and third embodiments.  (*See* Ex. B, Figs. 8, 12.)  In the

19  fourth embodiment, "the support portions 12 and 14 can undergo independent arcuate

20  movement . . . in the same manner as has been previously described." (*Id.* at 11:39–42.)  The

21  rearwardly extending free end sections 145 of the fourth embodiment "are spaced from the

22  lower surface" (*Id.* at 13:43–45) and therefore do not interfere with the support portions'

23  movement during pedaling.  The free end sections 145 only come into contact in the event of

24  a "severely high load" that "would otherwise cause the [support] portions 12 and 14 to flex

25  about their hinges 20 and 22 to such a degree where the seat may be permanently distorted or

26  broken." (*Id.* at 13:49–53.)  In the tenth embodiment, the movement of the support sections

27  242 is likewise without interference.  (*See* Ex. B, Figs. 48, 50, 17:36–42.)

28          In the fifth embodiment of Figures 37–40, "[t]he seat functions in the same manner as

-8-          Specialized's Claim Construction Brief
Case No. CV 12-3844 JST

1    described with reference to the embodiment of FIGS. 23-35 except that the springs 182 act to

2    *slightly dampen the movement of the support portions* 12 and 14 and also facilitate return of

3    the support portions 12 and 14 during pedaling motion."  (*Id.* at 15:13–17 (emphasis added).)

4    Similarly, in the sixth embodiment of Figures 41–42 "the curved portion of the rail 40 which

5    forms the spring 190 *provides the same spring effect* as the coil springs 182 previously

6    described."  (*Id.* at 15:30–35 (emphasis added).)  Thus, in every hinged seat in the patent, the

7    movement of the support portions during pedaling is without interference or significant

8    dampening from the rails.

9          Icon argues that the specification teaches embodiments in which there is interference

10   or dampening of the movement of the support portions.  (Br. at 11.)  Specifically, Icon points

11   to the description of stop means (Ex. B, 13:43–56) and ribs on the underside of the shell.  (*Id.*

12   at 14:6–11.)  With respect to the stop means (i.e., the rearwardly extending free end sections

13   145 of the fourth embodiment), the specification teaches that these prevent the saddle from

14   being permanently distorted in the event of a "severely high load."  (*Id.* at 13:49.)  The

15   specification does not teach that rearwardly extending free end sections 145 affect the motion

16   that the support portions undergo as a result of pedaling.  Rather, the rearwardly extending

17   free end sections 145 of the fourth embodiment "are spaced from the lower surface" (*id.* at

18   13:43–45) and therefore do not interfere with the support portions' movement during

19   pedaling.   Thus, the specification's disclosure of stop means is fully consistent with

20   Specialized's construction.

21         With respect to the ribs, the specification describes that these can be positioned to

22   control the amount of flex about the hinges and that "[i]ncreasing the length and size of the

23   ribs will tend to increase stiffness and therefore decrease the amount of flexing movement

24   provided by the hinges 20 and 22."  (*Id.* at 14:6–11.)  The specification mentions shell design

25   and shell material as other design characteristics that can be varied to influence the amount of

26   flex, depending on the intended application for the saddle.  (*Id.* at 14:20–24.)  The

27   specification does not suggest that ribs or other shell design characteristics could be

28   employed to negate the hinging effect and still practice the invention, only that these are

among the variables in the shell design that influence the degree of flex in the hinge. According to the teachings in the specification, the degree of flex in the hinge is a result of the design and materials of the shell (*id.* at 14:6–9; 14:20–21; 14:33–37), while the absence of interference or significant dampening is a result of how the saddle is supported by the rails. (*Id.* at 8:56–58; 15:13–17; 15:30–35.) Thus, the specification's teachings that the hinges can be more or less flexible based on shell materials and rib configurations is fully consistent with the understanding that the hinge limitations require that the support portions move without interference or significant dampening.

>       **f.     The Nose Is Held Substantially Still While the Support Portions Rotate About the Hinges**

The specification teaches that "when the rail 40 is coupled to a bicycle . . . ***the front portion 18 is held substantially still*** and the support portions 12 and 14 are able to move by flexing movement of hinges 20 and 22 relative to the front portion 18." (*Id.* at 8:54–63 (emphasis added).) The specification provides detailed descriptions of the movement of the support portions and the hinge, but does not describe any embodiment in which the nose moves during pedaling. To the contrary, the patent repeatedly emphasizes that the later embodiments function in the same manner as the first embodiment except for the differences that are expressly discussed. (*Id.* at 10:12–16; 10:32–34; 11:35–42; 15:13–17.)[2]

>       **g.     There Is No Hinge If the Support Portions Are Not Free to Rotate Without Interference or Significant Dampening While the Nose Is Held Substantially Still**

Icon argues that Specialized's construction imports limitations from the specification, but every portion of Specialized's construction is essential to what the hinge limitations

---

[2] In using the phrase "the front portion 18 is held substantially still" the inventor, of course, recognized that the nose of the saddle moves during riding. The saddle is mounted on a bicycle such that the nose (and the rest of the saddle) is traveling sometimes at high rates of speed and is not "still" in this sense. To account for this, the support portions are described as moving "relative to the front portion." (*See, e.g.*, *id.* at 8:54–63.) Thus, the nose is "still" relative to the support portions even though both will be moving in use.

require according to the patent.  The concept that the hinge allows the support portions to rotate about a nose that is substantially still is essential to the meaning of a hinge.  As Icon correctly points out, in the preferred embodiment, the saddle is constructed of an integral shell made of flexible material.  (Br. at 9.)  An integral flexible shell, without more, does not have a hinge, just as a trampoline or tennis racquet head are not hinged.  The patent teaches that an integral shell is hinged if the support portions can rotate without interference (or significant dampening) about the hinge while the nose is substantially still.  There are undoubtedly various support structures, such as different configurations of rails, that could accomplish this result and such structures are not a part of Specialized's construction.  But in order to have a hinge, the support portions have to be free to rotate relative to the nose—i.e., the support portions rotate about the hinge while the nose remains substantially still.  Otherwise, one simply has a hingeless saddle formed of flexible material that can flex along its length.

### 3. Specialized's Construction Avoids the Mythos Prior Art; Icon's Does Not

"[C]laims should be read in a way that avoids ensnaring the prior art if it is possible to do so."  *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 24 (Fed. Cir. 2000).  Specialized's construction is faithful to this rule because the line it draws excludes the prior art Mythos saddle and is also consistent with the intrinsic record.  Conversely, by stripping out much of the meaning of the hinge limitations as described in the patent, Icon's constructions render the claims so broad that they encompass the prior art, including Mythos.

The Mythos bicycle saddle was being marketed in the U.S. by at least 1993.  (Ex. I; Ex. J.)  Specialized has located evidence of numerous sales and public uses of Mythos in the U.S. during 1994 and 1995.  (Ex. J; Ex. K; Ex. L; Ex. BB.)  The version of 35 U.S.C. § 102(b) that applies in this case bars patentability when the invention was in public use or on sale in the U.S. "more than one year prior to the date of the application for patent in the United States."  The '180 patent issued from a PCT application filed Dec. 2, 1997, which claimed priority to three Australian applications filed as early as December 9, 1996.  (Ex. B, cover page.)  In these circumstances, pursuant to 35 U.S.C. § 363, the filing date for § 102(b)

1   purposes is the filing date of the PCT application, not the date of the foreign application to

2   which the PCT application claims priority.  *Group One, Ltd. v. Hallmark Cards, Inc.*, 254

3   F.3d 1041, 1043–45 (Fed. Cir. 2001); *Powdermagic, Ltd. v. Rossignol Ski Co.*, 2005 WL

4   3981617, at *5 (D. Utah 2005).   Thus, Mythos qualifies as § 102(b) prior art to the '180

5   patent because it was on sale and in public use in the U.S. more than a year before Dec. 2,

6   1997.

 

(Ex. M, pp. 1, 4.)

13      As shown in the photographs above, the Mythos includes a nose and rear portions

14  separated by a longitudinal slot.  Because of this slot, the flexibility inherent in any plastic

15  shell allows the rear portions to move independently during pedaling.  Indeed, the packaging

16  for the Mythos states that "[t]he separate rear support gives the saddle outstanding flexibility

17  in order to eliminate all the discomfort of conventional rigid saddles."  (Ex. M, p. 7.)  The

18  packaging further describes that the Mythos is constructed of a Nylon shell and that the rails

19  are "extremely strong, non-deformable, and lightweight."   (*Id.*)    Thus, unlike any

20  embodiment described in the '180 patent, the Mythos saddle has a rigid rail fixedly joined to

21  the rear of the saddle.  Like the Mythos prior art saddle, the Specialized saddles Icon accuses

22  of infringing the '180 patent have rigid rails affixed to their rear portions.  The excerpt below

23  from Icon's infringement contentions shows an example of an accused Specialized saddle.

1  (Ex. H, p. 8.)[3]  Thus, in an attempt to encompass the Specialized saddles, Icon has proposed

2  an overly broad construction that reads on the Mythos saddle and would therefore render the

3  claims invalid under § 102(b).

4        Specialized's construction of the hinge limitations avoids ensnaring Mythos because it

5  requires that the support portions "independently rotate in an arc about the region without

6  interference or significant dampening, while the nose/front portion is held substantially still."

7  In the Mythos, the rigid rails fixed to the rear portions interfere with the rotation of the rear

8  portions.  In view of the Mythos saddle, the rule that claims should be construed to avoid the

9  prior art provides additional support for Specialized's construction.

10        **4.        In Prosecuting Foreign Counterpart Patents, the Patentee Distinguished**

11              **Saddles with Rigid Rails Fixed to the Rear Support Portions**

12        The prosecution records of foreign related patents provide still further support for

13  Specialized's proposed claim constructions.  Courts have relied on foreign prosecution in

14  interpreting the claims of U.S. patents based on the Federal Circuit's guidance that "when

15  such matters comprise relevant evidence they must be considered."  *ActiveVideo Networks,*

16  *Inc. v. Verizon Communs. Inc.*, 801 F. Supp. 2d 465, 494 (E.D. Va. 2011) (quoting

17  *Caterpillar Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110, 1116 (Fed. Cir. 1983).  In *Apple, Inc.*

18  *v. Motorola, Inc.*, 2011 WL 10004441 (W.D. Wis. Oct. 13, 2011), the court relied on

19  statements made during prosecution of a Japanese application when it shared the same title

20  and inventors, contained a claim identical to the U.S. claim being interpreted, and concerned

21  obviousness, a requirement common to both U.S. and Japanese patent law.  Further, the

22  relevant portions of the foreign prosecution "simply describe[d the patentee's] understanding

23  / / /

24  / / /

25

26  _____

27        [3] Specialized references the accused products to provide the context of the claim construction disputes for the '180 patent. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006) (courts are not forbidden from glimpsing at the accused product during claim construction).

28

1    of its own invention and the ways in which it differed from existing technology."  *Id.* at *15.

2    These same factors support consideration of the counterparts to the '180 patent.

3            **a.**    **The Patentee Distinguished Saddles with Rigid Rails Fixed to the**

4               **Support Portions in Prosecuting the Taiwanese Counterpart**

5        Taiwanese Patent Application No. 090216667 claims priority to the same three

6    Australian patent applications as the '180 patent, and names as the applicant the same

7    inventor as the '180 patent.  (Ex. O, pp. 1–2; Ex. Q, p. 2.)  On February 23, 2001, the

8    examiner rejected several claims in the Taiwanese application as obvious based on European

9    Patent Publication No. 0603138A1 to Bigolin.  (Ex. O, p. 2.)  The Bigolin reference lists as

10   the applicant Selle Italia, the maker of the Mythos saddle, and the saddle it depicts is similar

11   to the Mythos.  (Ex. N.)




17       The Response dated September 28, 2001 presented an amended claim set (Ex. R) and

18   arguments responding to the rejections.  (Ex. Q.)  The amended claims included a Claim 4

19   that was identical to Claim 12 of the '180 patent.  (*Compare* Ex. R, p. 1 *with* Ex. B.)  In the

20   remarks, the applicant argued that in the Bigolin reference, "the supporting frame extends

21   from the nose part of the seat cushion to the tail part, which is different from [the

22   circumstance whereby] the end part of the supporting frame as stated in New Claim 4 of this

23   case terminates at the central portion of the seat cushion."  (Ex. Q, p. 1.)  On July 31, 2002,

24   the examiner granted the patent.  (Ex. S.)  In the reasons for patentability, the Examiner's

25   Opinion stated that in

26          the structure of a commonly seen bicycle saddle . . . its supporting frame . . .

27          extends from the nose part of the seat cushion to the tail part, which makes the

28          deformation resulting from the effects of the weight on the seat cushion

1    concentrate on the central area, so that its comfort is relatively poor. . . .

2    (*Id.* at p. 4.)  The Opinion contrasted that prior art approach with "the design in this case, [in

3    which] the end part of its supporting frame terminates at the central position of the seat

4    cushion."  (*Id.*)

5    **b.    In the Korean Counterpart, the Patentee Again Distinguished**

6    **Saddles with Rigid Rails Fixed to the Support Portions**

7    The applicant faced another obviousness rejection based on Bigolin in a South Korean

8    counterpart, and again distinguished Bigolin on the basis that the rail is attached to the rear

9    portion of the saddle.  The Korean patent issued from the same PCT application as the '180

10   patent, claims priority to the same three Australian applications, and lists the same inventor.

11   (Ex. U, p. 1.)  In response to the rejections, the applicant argued that Bigolin did not include a

12   hinge and that "the bent metallic pipe component (4) supporting the frame (2) restricts the

13   movement of the rear part of the saddle." (Ex. W, p. 20.)  The amendment accompanying this

14   submission shows that the rejected Claim 3 was the same as Claim 3 in the '180 patent, and it

15   depended from Claim 1 that was very similar to Claim 1 in the '180 patent.  (Ex. V, p. 4.)

16   The prosecution of the Taiwanese and Korean counterparts are pre-litigation examples

17   of the patentee explaining that a saddle with divided rear portions fixed to rigid rails was

18   outside the scope of his invention.  Indeed, in both cases, he distinguished the Bigolin prior

19   art reference on that basis.  This is further support for Specialized's construction, which

20   would exclude such saddles because the rigid rail fixed to the rear portions interferes with

21   their rotation.

22   **5.    The Licensing of the '180 Patent Supports Specialized's Construction**

23   The licensing of the '180 patent sheds further light on how the patentee understood

24   the patent's scope before this litigation began.  *See Frolow v. Wilson Sporting Goods Co.*,

25   710 F.3d 1303, 1311 (Fed. Cir. 2013) (holding that patent markings and licensing payments

26   constituted extrajudicial admissions that were relevant to whether products were within the

27   scope of patent claims).  The previous owner of the '180 patent licensed the patented "Nelson

28   Seat Technology" to Selle San Marco, as stated in Selle San Marco's 2005 product catalog.

(Ex. X, p. 18.)  As seen in the photo below, reproduced from that catalog, the rails in the Nelson Saddle joined the lower surface of the shell at a central portion of the saddle, and were spaced apart from the lower surface as they ran rearward from that central portion, similar to the fourth embodiment in the '180 patent shown in Figures 23–36.  The Selle San Marco catalog also includes many saddles with divided rear support portions fixed to rigid rails, such as the Rever, Aspide Arrowhead, and SKN saddles.  (*Id.* at pp. 5–15.)

**Licensed San Marco Nelson Saddle**                    **Unlicensed San Marco Rever Saddle**

 

    As part of its defense of this case, Specialized purchased Selle San Marco Nelson, Rever, Aspide Arrowhead, and SKN saddles.  In the samples Specialized purchased, the Nelson saddle is marked with the '180 patent number, and the other three having full length rails are not.  (Olson Decl., ¶ 21.)  Icon has also confirmed that of the saddles in Selle San Marco's 2005 product catalog, only the Nelson-branded saddles were covered by the license. (Ex. AA, p.3; Ex. X, pp. 16–19).  Thus, the San Marco licensing history is yet another pre-litigation example in which the scope of the '180 patent was treated as not covering saddles with divided rear support portions fixed to rigid rails.

    **6.**    **Specialized's Construction, Not Icon's, Is Consistent with the Ordinary Meaning of a Hinge**

    In the Joint Claim Construction Statement, both parties cited the American Heritage dictionary in support of their constructions of the hinge limitations.  (Dkt. No. 52, Ex. A at 1, Ex. B at 5.)  Hinge is defined there as "1.a. A jointed or ***flexible*** device that ***allows the turning or pivoting*** of a part, such as a door or lid, ***on a stationary frame***."  (Ex. Y, p. 3 (emphasis added).)  Consistent with this definition, Specialized's construction includes the features that flexing allows the support portions to rotate about the region while the nose is

1    held substantially still.

2    Conversely, even though Icon urges that the plain and ordinary meaning of hinge

3    should govern (Br. at 8), and this is the only dictionary Icon cited, Icon's construction takes

4    one word from this definition and disregards the rest. Icon's constructions of the hinge

5    limitations largely restate the actual claim language, and interchanges the phrase "a flexible

6    area . . . that allows flexing to occur" in the place of the word hinge. (Br. at 6–7.) Minus the

7    redundancy—a flexible area *always* allows flexing to occur—Icon's construction is simply

8    that a hinge is a flexible area. This is far too broad for an ordinary meaning of a hinge. A

9    trampoline, an outstretched hammock, the head of a tennis racquet—these all have flexible

10   areas, but not hinges. Icon's construction is based upon the premise that any seat made of a

11   flexible material is hinged. That premise is clearly wrong. Under that premise, virtually

12   every bicycle seat would be hinged. Icon's construction strips away the defining

13   characteristics of a hinge and leaves only the amorphous concept of a flexible area.

14   Accordingly, Icon's construction is overly broad and should be rejected.

15   **C.    The Stop Means Terms**

16   The stop means limitations present a straightforward application of well-established

17   principles under 35 U.S.C. § 112, ¶ 6. The parties agree that § 112, ¶ 6 applies (Br. at 12) and

18   that the functions are those expressly recited in the claims. (Br. at 13.) However, the parties

19   disagree on what structure described in the specification corresponds to the claimed

20   functions. In construing a means-plus-function, "structure disclosed in the specification

21   qualifies as 'corresponding' structure only if the specification or prosecution history clearly

22   links or associates that structure to the function recited in the claim. This duty to link or

23   associate structure to function is the *quid pro quo* for the convenience of employing § 112,

24   ¶ 6." *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291,

25   1298 (Fed. Cir. 2005) (internal citations omitted).

26   The specification describes the stop means in connection with the fourth embodiment,

27   and clearly links the rearwardly extending free end sections of the rail with the function of

28   limiting the amount of movement of the support portions. (Ex. B, 13:43–47. *See also id.* at

12:45–47; 14:49–50.) The specification repeatedly emphasizes that the free end sections of the rails that form the stop members are spaced from the lower surface of the shell. (*Id.* at 13:44–45; 13:57–58; 3:47–50.) This space is critical, because the specification describes that the free end sections of the rails limit the movement of the support portions when the support portions are pushed so far down that they bottom out or come into contact with the free end sections. (*Id.* at 13:53–56; 12:49–50.)

Specialized's construction of the stop means terms identifies every structure that the specification links to the claimed function. Indeed, Icon's section of the Joint Statement setting forth the intrinsic evidence relevant to these limitations cites the same portions of the specification as Specialized cites for its construction, with one exception. (Dkt. No. 52, Ex. A at 3, Ex. B at 5.) The exception is that Icon also cites the fifth embodiment described at col. 15, lines 1–7. But the specification does not link any structure in that embodiment with the claimed function, so it cannot be corresponding structure. *Default Proof*, 412 F.3d at 1298.

Icon argues that the corresponding structure is the end portions of the mounting brackets—in any configuration, not just spaced apart from the lower surface of the shell as described in the specification. But "corresponding structure must include all structure that actually performs the recited function." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002). End portions alone are not enough to accomplish the claimed function. For example, if the rails are confined to the nose of the saddle, as in the first embodiment of the '180 patent (*see* Fig. 2), the end portions of the rail will not limit the movement of the support portions. The specification described a specific configuration of free end sections of the rail that accomplishes the limiting function, and that is the corresponding structure.

Icon relies heavily on a claim differentiation argument based on Claim 13, but the Federal Circuit has "long held that a patentee cannot rely on claim differentiation to broaden a means-plus-function limitation beyond those structures specifically disclosed in the specification." *Saffran*, 712 F.3d at 563. If this were permitted, a patentee could easily

1   expand the scope of a means-plus-function claim term beyond the specification's disclosure

2   simply by including a dependent claim.  This would "avoid[] the express mandate of section

3   112(6)."  *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991).

4        Moreover, Claim 13 adds other limitations beyond the limitation "spaced from the

5   lower surface of the shell."   Specifically, Claim 13 adds the limitation of a mounting rail for

6   mounting the seat to the bicycle.  Thus, Claim 13 differs in scope from Claim 12 apart from

7   the limitation in question and the doctrine of claim differentiation is inapposite factually as

8   well as legally.

9   ## II.  THE '938 PATENT

10  ### A.   Background of the '938 Patent

11       The '938 patent covers a bicycle seat upon which a rider cannot sit vertically without

12  support.   As succinctly stated in the Abstract, the seat does "not allow the rider to

13  permanently sit in a vertical position without other support so that the rider is permanently

14  supported in a generally standing position on the bicycle pedals so as to be in a position to

15  deliver substantially maximum pedal power."   The seat having a sharply inclined abutment

16  segment 14 is illustrated in Figure 1 below:



22  The patent distinguishes this configuration from prior art seats: "Conventional bicycle seats

23  generally comprise a horizontal surface on which a rider can sit." (Ex. A, 1:15–16.)

24       The '938 patent faced an uphill battle in the Patent Office, with the Examiner

25  repeatedly rejecting the claims for lack of novelty.   In response to these rejections, the

26  patentee time and again emphasized that the alleged invention was a seat that did not permit a

27  rider to sit vertically without support.  (*See, e.g.*, Ex. C at p. 9 ("without other support it is not

28  possible for the rider to sit with all of his or her weight on the abutment means"); *id.* at p. 11

1    (the prior art reference, Barker et al., "fails to teach or suggest providing an abutment means

2    that is permanently mounted to be transverse with respect to the horizontal so that without

3    other support, a rider cannot sit on a seat."); *see also* Ex. G at pp. 11-12; Ex. D, p. 4.)

4          Having received its patent for a bicycle seat upon which a rider cannot sit, Icon is now

5    asserting the '938 claims against Specialized's saddles, upon which riders can easily sit

6    vertically without support.



10   (Ex. H, p. 9.)

11         Thus, the Specialized saddles have horizontal seats like the prior art seats which the

12   patentee distinguished in order to obtain the patent.  "Claims may not be construed one way

13   in order to obtain their allowance and in a different way against accused infringers."

14   *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).  Icon's

15   frivolous assertion of the '938 patent in this case flouts this precept, treating the claims as the

16   proverbial "nose of wax."  *Id.* at 1578.  The Court should interpret the invention claimed in

17   the '938 patent as the patentee repeatedly described it throughout the specification and

18   prosecution of the patent.

19   **B.**      **The Permanently Transverse Term**

20          **1.**      **Specialized's Construction Is Fully Supported by the Intrinsic Record**

21         Specialized's construction of this term is derived entirely from the intrinsic record, in

22   which the patentee explained the invention and how it differed from the prior art:

23         [T]he [abutment] segments do not allow the rider to permanently sit in a
             vertical position without other support so that the rider is permanently
24         supported ***in a generally standing position*** on the bicycle pedals. (Ex. A,
             Abstract (emphasis added).)

25
           ***Conventional bicycle seats generally comprise a horizontal surface on which***
26         ***a rider can sit.***  (*Id.* at 1:15–16 (emphasis added).)

27         As is clearly shown in FIG. 1, the segments 14 are inclined with respect to the
             horizontal ***to such an extent that it is not possible for a rider to sit on the seat***
28         ***permanently without some other vertical support because the rider will***

*simply slip forward on the seat*.  Thus, the seat does not allow the rider to permanently sit vertically with the rider's backbone in a generally vertical position and *forces the rider to take up a generally standing position* on the bicycle. . . .  (*Id.* at 4:20–27 (emphasis added).)

[T]he seat in Barker et al. can be, and is, placed in a completely horizontal position . . . during pedalling and it is the object of Barker et al. to *enable a rider to sit normally on the support portions* of the seat so that the rider's complete weight is fully supported by the support portions.  It is not the intent of Barker et al. to *place the rider in a standing position* where the abutment portions basically provide reaction so that the rider can deliver maximum power.  (Ex. C at p. 11 (emphasis added).)

[Invention overcame problems with prior art saddles] by supporting the seat in an inclined position relative to the longitudinal axis of the bicycle, so as to *prevent the rider from sitting on the inclined surface of the seat* with the rider's backbone arranged in a generally vertical orientation.  (Ex. D at p. 4 (emphasis added).)

Icon asserts that Specialized's construction unduly narrows the claim (Br. at 17–18), but Icon does not point to any evidence in the intrinsic record that the permanently transverse limitation is broader than Specialized's construction.  Further, the statements from the specification and prosecution history on which Specialized's construction is based are not illustrations, examples, or options that a saddle may include in addition to the claimed features; they are explanations of what the permanently transverse limitations mean.

**2.**   **Icon's Construction Eviscerates the Meaning of the Permanently Transverse Term**

The most important difference between the parties' constructions of the permanently transverse term is Icon's attempt to inject the phrase "while in a riding position" into the construction of this term.  Icon attempts to equate "riding position" with the position shown in Figure 5.  (Br. at 18.)  Icon includes Figure 5 in its brief and argues that "[a]s shown in Figure 5 of the '938 patent, while in a riding position, a rider will not be able to sit on the inclined surface/abutment means with his backbone arranged in a vertical direction without other supports. . . ." (Br at 18) (emphasis original).  Thus, "riding position" to Icon occurs when the rider is leaning forward such that his backbone is not vertical and is almost horizontal, with the rider's hands on the handlebars.  But when the rider is in this position *on any bicycle seat,* by definition, the rider is not vertical and is leaning forward with support

1    from the handlebars.   The claims so construed would become a tautology completely

2    eviscerating the critical limitation in question.  The proper interpretation of the limitation is

3    whether the seat in question prevents the rider from sitting vertically without support, not

4    whether the seat permits the rider to lean forward in the position shown in Figure 5 such that

5    his backbone is not vertical and he gains support from the handlebars.

6         Icon's infringement contentions make clear that Icon's construction is an effort to

7    remove all meaning of the permanently transverse phrase:



The center of gravity of the rider is forward of the ischial contact on the seat.  This means that in the absence of other support, such as pedals or handlebars, the weight of the rider will cause a moment which turns the rider forward.  Therefore the rider cannot be arranged generally vertically without support.

Direction of Spine

Center of gravity forward of the ischial contact region

Ischial Bone support force

17   (*See* Ex. H, p. 11.)

18        Thus, under Icon's construction, if a rider's center of gravity is forward of the seat

19   when the rider is leaning forward in a riding position, the limitation is met because the rider

20   will fall forward unless he is supported by handlebars or pedals.  Under this construction, the

21   permanently transverse limitation is met by any bicycle saddle.  Icon cannot be permitted to

22   render this permanently transverse limitation meaningless by inserting the phrase "while in a

23   riding position."  *See Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir.

24   2007) (claims should not be construed in a way that renders a claim term meaningless or

25   superfluous); *Bicon, Inc. v. Straumann Co.*, 441 F. 3d 945, 950 (Fed. Cir. 2006) ("claims are

26   interpreted with an eye toward giving effect to all terms in the claim" because doing

27   otherwise would undermine the public notice function of patents).

28        The Court should reject this aspect of Icon's construction as contrary to the language

of the claims themselves, the description in the specification, and the patentee's emphasis of the significance of this limitation during prosecution.

### 3. Specialized's Construction Regarding the Orientation of the Abutment Means Is Easy to Understand and Apply, While Icon's Construction Is Confusing

Specialized's construction explains in plain English what is meant by the technical and somewhat opaque claim phrase "transverse with respect to the longitudinal axis of the bicycle": that the abutment means is inclined with respect to the horizontal as viewed from either side of the bicycle.  Specialized's construction phrases the term in a way that can be easily understood and applied by the jury.  *Power-One, Inc. v. Artesyn Techns., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must 'ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.'").

In contrast, Icon's construction compounds the confusion of this claim phrase by interpreting it to mean "on an inclined axis that crosses the longitudinal axis of the bicycle." This inscrutable construction would hinder rather than help the jury in understanding what the claims require.  In its infringement contentions, Icon indicates that under its construction, Icon intends this term to encompass saddles that slope from the middle toward the sides. (*See* Ex. H, p. 10.)  This understanding of the claim limitation has no support in the intrinsic record.  Indeed, a saddle that is sloped from the middle toward the sides does not "prevent the rider from sitting on the inclined surface of the seat with the rider's backbone arranged in a generally vertical orientation," as the patentee summarized "the present invention" during prosecution.  (Ex. D, p. 4.)  The Court should reject this aspect of Icon's construction as yet another attempt to rewrite the claim terms in a manner that is inconsistent with the specification and prosecution history.

### C. The Abutment Means Terms

The abutment means phrase was inserted by the Applicant during prosecution in order to overcome rejections under 35 U.S.C. § 112, ¶ 2 in which the Patent Office examiner

1    rejected the claims as being "replete with indefinite and functional or operational language."

2    (Ex. Z, p. 3.)  In response to these rejections, the patentee amended the claim language from

3    "an abutment portion" or "an abutment surface" to "an inclined surface forming abutment

4    means."  (Ex. C, pp. 2–5.)  Importantly, the patentee expressly represented that "[b]y this

5    amendment, Applicant has amended the claims to recite the structure in means-plus-function

6    terminology."  (*Id.* at p. 8.).

7           Icon acknowledges that the use of the word "means" creates a presumption that

8    Section 112, ¶ 6 applies.  Icon argues that the presumption is overcome because the claims

9    recite the structure that allegedly performs the identified functions—an inclined surface.  (Br.

10    at 21.)  But the inclined surface claim language was added in the same amendment in which

11    the patentee told the Patent Office that the claims were in means-plus-function format.  (Ex.

12    C, pp. 2–5, 8.)   Thus, the recitation in the claims of an inclined surface cannot be used to

13    reverse the clear and unequivocal position that the patentee took during prosecution that these

14    are means-plus-function claim terms.   In arguing that an inclined surface is sufficient

15    structure, Icon's construction renders the "abutment means" phrase mere surplusage,

16    undermining the public notice function of the claims and file history.  *See Stumbo*, 508 F.3d

17    at 1362; *Bicon*, 441 F.3d at 950.

18           Icon cites *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256 (Fed. Cir. 2008) to argue that

19    amending a claim to add "means" does not compel the conclusion that it is a means-plus-

20    function claim term.  In *TriMed*, the Federal Circuit found that an amendment adding the

21    word "means" did not convert a term to means-plus-function format because the remarks

22    accompanying the amendment indicated that the patentee intended for the structures recited in

23    the claim to be sufficient by themselves to accomplish the functions.  *Id.* at 1261.  Thus, the

24    prosecution history showed that, despite the use of the word "means," the amendment was not

25    intended to be a means-plus-function term.  Here, the opposite is true.  The patentee expressly

26    told the Patent Office that its amendments were intended to put the claims in means-plus-

27    function format.  (Ex. C, p. 8.)

28           Once the court determines that the presumption is not overcome, means-plus-function

claims are interpreted to cover only those structures disclosed in the specification that correspond to the recited function. *Default Proof*, 412 F.3d at 1298. The functions as recited in the claims in issue are repeated in Specialized's construction. As to the corresponding structure that performs the recited functions, Specialized correctly cites to the abutment segments 14 as shown in Figures 1-5 and described at 4:5-12, 4:20-47, and 4:52-63. Thus, Specialized's construction should be adopted.

In the event the Court is not inclined to construe the abutments means terms under § 112, ¶ 6, Specialized does not believe the terms require construction. Icon's baseline position on these terms is that they should not be construed. (Br. at 19–20.)[4] Thus, the claim construction dispute on these terms boils down to whether § 112, ¶ 6 governs. If so, Specialized's construction should be adopted because it correctly identifies the functions and corresponding structures, and Icon does not argue otherwise nor offer any competing § 112, ¶ 6 construction. Conversely, if the Court finds that § 112, ¶ 6 does not govern, the parties agree that no construction is necessary.

### III.  CONCLUSION

Specialized respectfully requests that the Court adopt Specialized's proposed constructions as set forth in the Joint Claim Construction Statement. (Dkt. No. 52, Ex. B.)

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:    August 16, 2013          By:   */s/Darrell L. Olson*
                                        Darrell L. Olson
                                        Timothy J. Goodson

                                   Attorneys for Defendant/Counterclaimant
                                   SPECIALIZED BICYCLE COMPONENTS, INC.

16002108

---

[4] Icon's alternative proposed constructions improperly add the "while in a riding position" limitation, which is unsupported and inappropriate for all the reasons discussed in Section II.B.2.