UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ICON-IP PTY LTD., <br><br>  Plaintiff, <br><br> v. <br><br> SPECIALIZED BICYCLE COMPONENTS, INC., <br><br>  Defendant. | Case No. 12-cv-03844-JST <br><br> **ORDER CONSTRUING CLAIMS OF UNITED STATES PATENT NOS. 6,254,180 AND 6,378,938** <br><br> Re: ECF No. 53 |

In this patent infringement action involving bicycle seats, the parties seek construction of ten terms used in the two patents-in-suit.

**I.   BACKGROUND**

   **A.   Patents-in-Suit and Remaining Asserted Claims**

Icon-IP Pty Ltd. ("Icon") alleges that Specialized Bicycle Components, Inc. ("Specialized") infringes two of its patents by manufacturing, selling, and/or offering to sell bicycles seats. Compl. ¶ 5. The following chart identifies the two patents-in-suit and the remaining asserted claims:

| Patent | Claims |
|---|---|
| U.S. Patent 6,254,180 ("the '180 patent") | 1, 3-6, 12, 14, 15, 17, 21, 22 |
| U.S. Patent 6,378,938 ("the '938 patent") | 1-3, 5, 11-14 |

   **B.   The '180 Patent**

The '180 patent, entitled "Bicycle Seat," claims a bicycle seat that includes two buttocks support portions. The support portions are coupled to a front portion and can be separated by a slot. A hinge connects each of the support portions and the front portion, so that the support portions can move in an arcuate manner in relation to the front portion and independent of each

1 other. This movement can take place during the pedaling motion of the bicycle, and as such, the
2 rider is comfortably supported in an energy-sufficient manner for pedaling the bicycle. The seat
3 may be formed as an integral shell that includes the supports portions, the front portion, and the
4 hinges. The shell may be supported by ribs that protrude from its lower surface, and may be
5 covered by upholstery. Also, a support rail can be coupled to the underside of the seat with nuts,
6 bolts, and/or receiving slots, and may have free ends that are positioned below the support
7 portions. These free ends may act as stops to limit the amount of movement of the support
8 portions. In addition, springs may exist between the rail and the shell.

The '180 patent also discloses a bicycle seat that is made up by a housing that has two portions, which are connected by a bridging passage. The housing contains fluid, so that the two support portions can expand and contract as pressure is applied to them during the pedaling motion of the bicycle. This embodiment, however, is not claimed and does not form a part of the parties' dispute.

Five of the ten terms to be construed are found in this patent.

### C. The '938 Patent

The remaining five terms are found in the '938 patent, which claims a bicycle seat that positions the rider in a posture that delivers greater pedal power without the rider having to raise herself from the seat of the cycle. The seat also increases rider comfort and reduces fatigue and soreness.

The seat includes an abutment means that is transverse with respect to the longitudinal axis of the bicycle. The abutment means is formed from two abutment segments that are connected together. The segments are dimensioned to support the gluteus maximus muscles adjacent the ischial bones, so that the majority of the gluteus maximus muscles are not in contact with the seat. The segments thus prevent the rider from permanently siting in a vertical position without other supports, so that she is permanently supported in a generally standing position on the bicycle pedals, thus delivering substantially maximum pedal power.

//
//

## II. LEGAL STANDARD

The construction of patent claim terms is a matter of law for the court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996). A "bedrock principle" of patent law is that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). In construing a term, the "objective baseline" is the "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" Id. at 1313. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification" and the prosecution history. Id.

The "primary basis for construing [a] claim" and "the best source for understanding a technical term" is a patent's intrinsic evidence. Id. at 1314. Intrinsic evidence includes the patent and its file history, including any reexaminations and reissues, related patents and their prosecution histories, and the prior art that is cited or incorporated by reference in the patent-in-suit and prosecution history. Id. Extrinsic evidence refers to all other types of evidence, including inventor testimony, expert testimony, documentary evidence of how the patentee and alleged infringer have used the claim terms, dictionaries, treatises, and other similar sources. Id. at 1318. Intrinsic evidence trumps any extrinsic evidence that would contradict it. Id. at 1314.

## III. DISCUSSION

### A. "hinge" terms — '180 patent claims 1, 12, 14

| Terms | Icon's proposed construction | Specialized's proposed construction |
|---|---|---|
| 1. "at least one hinge between each of the first and second portions and the front portion for allowing each of the first and second support portions to undergo substantially independent arcuate movement" (claim 1) | Icon contends that this claim term requires no construction. However, if the Court determines this claim requires construction, Icon contends the construction should be:<br><br>"at least one flexible area separating each of the support portions from the front portion[1] to allow flexing to occur between each of the first and second support portions and the front portion so that each of the first and second support portions undergo substantially independent arcuate movement" | The construction for each of Term Nos. 1-3 is:<br><br>"a specific localized region between each of the support portions and the nose/front portion that flexes during pedaling to allow each of the support portions to independently rotate in an arc about the region without interference or significant dampening, while the nose/front portion is held substantially still" |
| 2. "a hinge for allowing each of the first and second support portions to undergo substantially independent movement arcuate relative to one another and the nose portion" (claim 12) | Icon contends that this claim term requires no construction. However, if the Court determines this claim requires construction, Icon contends the construction should be:<br><br>"a flexible area separating each of the support portions from the front portion[2] to allow flexing between each of the support portions and the nose portion so that each of the first and second support portions may undergo substantially independent arcuate movement relative to one another and the nose portion" | |

---

[1] Icon's proposed construction recites "the nose," but since no such term exists in claim 1, the Court replaces it for its equivalent—"the front portion."

[2] Icon's proposed construction recites "the nose," but since no such term exists in claim 1, the Court replaces it for its equivalent—"the front portion."

4

| | | |
|---|---|---|
| 3. "a hinge allowing the two separate support portions to undergo substantially independently movement" (claim 14) | Icon contends that this claim term requires no construction. However, if the Court determines this claim requires construction, Icon contends the construction should be:<br><br>"a flexible area separating each of the support portions from the front portion[3] to allow flexing between each of the support portions and the nose portion so that the two separate support portions may undergo substantially independent movement" | |

**The Court adopts a modified version of Icon's proposed constructions, namely one in which the term "nose" in Icon's proposed constructions is replaced by the term "the front portion."**

This construction reflects what the inventors "intended to envelop with the claim[s]." Phillips, 415 F.3d at 1316. In Phillips, the Federal Circuit made clear that courts should primarily look to intrinsic evidence to determine the meaning of a claim term. Id. at 1313-14. Here, intrinsic evidence supports Icon's proposed construction.

As a preliminary matter, the Court finds that the "hinge" terms require construction. While "district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims," O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1362 (Fed. Cir. 2008), "claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." Id. Here, the Court finds that the "hinge" terms do not speak for themselves as to what the patent covers and their construction is therefore necessary.

Although the specification provides several embodiments of hinges, it does not define what a hinge is. In the Joint Claim Construction Statement, both parties cited the American Heritage Dictionary in support of their proposed constructions. Joint Claim Construction Statement, Ex. A at 1, Ex. B at 5. The dictionary defines a hinge as a "jointed or flexible device that allows the

---

[3] Icon's proposed construction recites "the nose," but since no such term exists in claim 1, the Court replaces it for its equivalent—"the front portion."

5

1 turning or pivoting of a part, such as a door or lid, on a stationary frame." Specialized's
2 Responsive Brief, Olson Decl., Ex. Y at 3. However, this ordinary and customary meaning of
3 does not provide guidance to the Court as to what a hinge is to one of ordinary skill in the art in
4 the context of the patent.

5 In its proposed construction, Icon equates a hinge with a "flexible area." Although this
6 interpretation is broader than the ordinary and customary meaning of the word "hinge," it reflects
7 what the patentee intended to encompass with the claims. In more than one instance, the
8 specification describes a hinge not merely as a specific, localized, and flexible region different
9 from the adjacent support portions and front portion. Instead, it considers the possibility of a
10 hinge being made from the same material as and formed integrally with the adjacent portions. For
11 example, "the hinges 20 and 22 are integral with the remainder of the shell 11, [and] the shell is
12 formed from a flexible material . . . ." '180 patent col. 8 ll. 17-19. Also, "[t]he seat 240 may be
13 formed from spring metal material or spring plastic material and in such an embodiment, the hinge
14 sections 246 are merely integral portions of the seat 240 and defined by the transition areas
15 between the buttock support sections 242 and the horn section 244." Id. col. 17 ll. 19-23.
16 Comparing the above with embodiments in which the hinge is made from spring material while
17 the adjacent portions from non-spring material, Id. col. 17 ll. 24-29, it is clear that the patentee
18 intended for the "hinge" terms to encompass all of these configurations.

19 Specialized argues that a construction that does not require the hinges to be specific and
20 localized regions necessarily means that they could overlap with or be part of the support or front
21 portion. This notion is unsupported by the claim language, however. "A claim element is a
22 discrete component or element of the device as set forth in the claim." Blumenthal v. Barber-
23 Colman Holdings Corp., 62 F.3d 1433 (Fed. Cir. 1995). Because the hinges, support portions, and
24 front portion are claimed as distinct elements, they are discrete and must be individually met for
25 purposes of finding infringement.

26 Specialized's proposed construction improperly incorporates extraneous limitations into
27 the claims. See 3M Innovative Props. Co. v. Tredegar Corp., 725 F.3d 1315, 1321 (Fed. Cir.
28 2013) (citation omitted) ("[W]hile [courts] construe the claims in light of the specification,

6

limitations discussed in the specification may not be read into the claims."). First, as discussed above, a hinge can comprise a transition area between the support and front portions and does not have to be specific or localized. Second, the claim language and specification do not require the movement by the support portions to be without interference or significant dampening. In fact, the specification discloses that there may be some interference and dampening. For example, the stop members limit the amount of flexing movement of the support portions. See '180 patent, col. 13 ll. 45-57. Also, the ribs underneath the seat increase the stiffness of the seat and decrease the amount of flexing movement. Id. col. 14 ll. 6-11. Third, there is no express language in either the claims or specification that requires the front portion to be held substantially still.

In addition, Specialized's proposed construction contains ambiguous terms that could result in jury confusion. For example, Specialized does not explain what it means for a region to be "specific" and "localized." It also does not explain how the support portions rotate "without interference or significant dampening," or what distinguishes "significant dampening" from "insignificant dampening."

Specialized also unpersuasively argues that Icon's proposed construction improperly covers prior art, namely the Mythos bicycle saddle. The Mythos saddle prior art is not a part of the intrinsic record. As such, Specialized's argument invites the Court to conduct an invalidity analysis as part of its claim construction. The Court declines to engage in an invalidity analysis at this stage of the litigation. The Federal Circuit has "acknowledged the maxim that claims should be construed to preserve their validity," but it "ha[s] not applied that principle broadly, and [it] ha[s] certainly not endorsed a regime in which validity analysis is a regular component of claim construction." Phillips, 415 F.3d at 1327. Indeed, the Federal Circuit "ha[s] limited the maxim to cases in which the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous." Id. (citations and internal quotation marks omitted); see also E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1434 (Fed.Cir.1988) (rejecting argument that limitations should be added to claims to preserve the validity of the claims). Here, the "hinge" terms are not "still ambiguous." As discussed above, Icon's proposed construction is amply supported by the language of the claims and the specification. Accordingly, the Court need

7

not engage in a claim construction exercise aimed at preserving the validity of the claims.

Finally, the Court finds the prosecution histories of the Taiwanese and South Korean patent applications irrelevant. Specialized refers to these histories to argue that "a saddle with divided rear portions fixed to rigid rails [is] outside the scope of [the] invention." Specialized's Responsive Brief at 15. Specialized quotes a dated Federal Circuit opinion, Caterpillar Tractor Co. v. Berco, S.p.A., which states in the context of determining claim scope: "Though no authority is cited for the proposition that instructions to foreign counsel and a representation to foreign patent offices should be considered, . . . when such matters comprise relevant evidence they must be considered." 714 F.2d 1110, 1116 (Fed. Cir. 1983). Caterpillar, however, only requires consideration of relevant evidence but provides no guidance on what is relevant. In the same sentence, the Caterpillar court actually noted that "the varying legal and procedural requirements for obtaining patent protection in foreign countries might render consideration of certain types of representations inappropriate . . . ." Id. On the other hand, the Federal Circuit has found foreign prosecution histories irrelevant for claim construction. In Pfizer, Inc. v. Ranbaxy Laboratories Ltd., the Federal Circuit agreed with the "district court's conclusion that the statements made during prosecution of foreign counterparts . . . are irrelevant to claim construction because they were made in response to patentability requirements unique to [foreign] law." 457 F.3d 1284, 1290 (Fed. Cir. 2006).

Even if the Court were to consider these foreign prosecution histories, however, they would not change the Court's analysis. The statements made to the foreign patent examiners were related to the rails extending to the rear of the seat or to the prior art's lack of a hinge, but not to the scope or meaning of the "hinge" terms. The statements thus do not shed light on what the patentee intended to encompass with the "hinge" terms. In the Taiwanese prosecution history, the applicant argued that in the Bigolin reference—the prior art at issue, "the supporting frame extends from the nose part of the seat cushion to the tail part, which is different from [the circumstance whereby] the end part of the supporting frame as stated in New Claim 4 of this case terminates at the central portion of the seat cushion." Specialized's Responsive Brief, Olson Decl., Ex. Q at 1. In the Korean prosecution history, the applicant argued that Bigolin did not

1  include a hinge and that "the bent metallic pipe component (4) supporting the frame (2) restricts
2  the movement of the rear part of the saddle." Id. Ex. W at 20.
3       Specialized also points to patent markings and a license between the '180 patent's previous
4  owner and Selle San Marco as indicative of the patentee's understanding of claim scope. The
5  Court finds this evidence irrelevant. The case relied on by Specialized, Frolow v. Wilson Sporting
6  Goods Co., is inapposite. 710 F.3d 1303 (Fed. Cir. 2013). First, there is no indication in Frolow,
7  a patent licensing dispute, that evidence considered for infringement and breach-of-contract
8  purposes should be considered in claim construction. Second, the Frolow court held: "Placing a
9  patent number on a product is an admission by the *marking party* that the marked product falls
10 within the scope of the patent claims." Id. at 1309-10 (emphasis added). The court did not hold
11 that licenses or markings constitute an admission regarding claim scope by the *patentee*. Further,
12 Specialized cites no case law to explain why the court should consider the license and markings
13 not by Icon, but by the '180 patent's previous owner. Although Icon is the successor in patent
14 interest, Specialized has failed to explain why Icon should be bound by third party statements.

### B.  "stop means" terms — '180 patent claims 12, 22

| Terms | Icon's proposed construction | Specialized's proposed construction |
|---|---|---|
| 4. "stop means for limiting the amount of movement of the first and second support portions" (claim 12) | Icon contends that this term is governed by 35 U.S.C § 112(f).<br><br>Function: "limiting the amount of movement of the first and second support portions"<br><br>Corresponding structure: "end portions of the mounting brackets and equivalents" | Term Nos. 4 and 5 are governed by 35 U.S.C. § 112(f).<br><br>Functions:<br>4. "limiting the amount of movement of the first and second support portions"<br>5. "limiting movement of the two support portions"<br><br>Corresponding structure: "the rearwardly extending free end sections 145 spaced from the lower surface of the shell 11 as shown and described in col. 3 ll. 47-50, col. 12 ll. 45-57, col. 13 ll. 42-65, col. 14 ll. 39-51, figs. 29, 32-36, and equivalents" |
| 5. "stop means is provided for limiting movement of the two support portions" (claim 22) | Icon contends that this term is governed by 35 U.S.C § 112(f).<br><br>Function: "limiting the amount of movement of the two support portions"<br><br>Corresponding structure: "end portions of the mounting brackets and equivalents" | |

**The Court adopts Specialized's proposed construction, but summarizes the**

**corresponding structure as: "as shown in figures 29 and 32-36, the rearwardly extending free end sections 145, which are spaced from the lower surface of the shell 11 and which extend from outwardly extending sections 159, where the sections 159 and 145 may form a continuously curved profile."**

Icon and Specialized agree that the functions of the "stop means" terms in claims 12 and 22 are "limiting the amount of movement of the first and second support portions," and "limiting the amount of movement of the two support portions," respectively. The only issue before the Court, therefore, is the corresponding structure. The Court concludes that Specialized's proposed structure is necessary for performing the claimed functions in the specification. Icon's proposed structure, on the other hand, encompasses unnecessary elements.

In construing a term under § 112(f), "structure disclosed in the specification qualifies as 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim. This duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112[(f)]." Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291, 1298 (Fed. Cir. 2005) (internal citation omitted).

In the embodiment depicted in figures 23-36, the '180 patent links the rearwardly extending free end sections of the rail to the claimed function of limiting the amount of movement of the support portions. '180 patent col. 13 ll. 43-47 ("The rear portions 145 form stop members which limit the amount of flexing movement of the portions 12 and 14 relative to one another and the nose 18 . . . ."). The specification makes clear that the free end sections that form the stop members are those that are spaced from the lower surface of the shell, not other types of end sections. Id. col. 3 ll. 47-50, col. 13 ll. 43-47, 57-58. In other embodiments, the specification does not mention that the end sections therein form stop members. For example, in the embodiment described in figures 37-40, the ends of the mounting rail extend to below the support portions, but the specification does not link these ends to the function of the stop means—limiting the amount of movement of the support portions. This supports Specialized's proposed construction.

Icon correctly points out that "a court may not import . . . structural limitations from the

written description that are unnecessary to perform the claimed function." Icon's Opening Brief at 13 (citing Wenger Mfg., Inc. v. Coating Machinery Sys., Inc., 239 F.3d 1225, 1233 (Fed. Cir. 2001)). Icon thus argues that Specialized's proposed construction improperly imports a limitation into "stop means" by "requiring the end portions of the mounting bracket to be 'spaced from the lower surface of the shell 11.'" Id. at 13-14.

However, while the Court cannot import *limitations* that unnecessarily constrict the breadth of the corresponding structure, neither can it unduly broaden the breadth by including *structure* that is unnecessary for performing the claimed function. "The corresponding structure to a function set forth in a means-plus-function limitation must be necessary to perform the claimed function." Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc., 389 F.3d 1370 (Fed. Cir. 2004) (internal quotation marks omitted). Here, Icon's proposed construction improperly includes structures unnecessary for performing the claimed function. See Northrop Grumman Corp. v. Intel Corp., 325 F.3d 1346, 1352 (Fed. Cir. 2003). Icon's proposed construction lacks the phrase "spaced from the lower surface of the shell," which limits the kind of end sections that perform the claimed function. Without this limitation, the claimed structure may encompass any type of end sections, even those shown in figures 1-22, which do not perform the claimed functions. Since these end sections are unnecessary for performing the claimed functions, they cannot be the corresponding structure.

Icon also argues that the language in dependent claim 13 "provides strong evidence against the construction proposed by Specialized," because dependent claim 13 contains the limitation "[t]he bicycle seat of claim 12, wherein the bicycle seat includes a mounting rail for mounting the seat to a bicycle and *the stop means comprises end portions of the mounting rail which are spaced from the first and second support portions and positioned below the first and second support portions*." Mot. at 14 (emphasis added).

The doctrine of claim differentiation provides that "[t]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." Acumed LLC v. Stryker Corp., 483 F.3d 800, 806 (Fed. Cir. 2007). "That presumption is especially strong when the limitation in dispute is the only meaningful

difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." Id.

Here, Icon is correct that the doctrine of claim differentiation raises a presumption that independent claim 12 does not contain the "stop means" structure, because that structure is the only meaningful difference between claim 12 and dependent claim 13. This presumption is rebutted here, however. The statutorily mandated scope of means-plus-function terms cannot be broadened by claim differentiation. See, e.g., Saffran v. Johnson & Johnson, 712 F.3d 549, 563 (Fed. Cir. 2013) ("[A] patentee cannot rely on claim differentiation to broaden a means-plus-function limitation beyond those structures specifically disclosed in the specification."); Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1304 (Fed. Cir. 2005) ("[A]lthough the doctrine of claim differentiation suggests that claim 5 should be broader than claim 1, any presumption that the claims differ with respect to this feature may be overcome by a contrary construction mandated by the application of § 112[(f)]."). A construction lacking the "stop means" structure would impermissibly broaden the scope of claim 12 beyond the structures disclosed in the specification.

**Therefore, the Court adopts Specialized's proposed construction because it points to the corresponding structure necessary for performing the claimed function, and nothing more. For the sake of clarity and convenience of the jury, the Court summarizes this structure as: "as shown in figures 29 and 32-36, the rearwardly extending free end sections 145, which are spaced from the lower surface of the shell 11 and which extend from outwardly extending sections 159, where the sections 159 and 145 may form a continuously curved profile."**

C. "permanently transverse" — '938 patent claims 1, 5, 11-14

| Terms | Icon's proposed construction | Specialized's proposed construction |
|---|---|---|
| 6. "permanently transverse with respect to the longitudinal axis of the bicycle when the support means couples the seat to the bicycle so that | Icon contends that this claim term requires no construction. However, if the Court determines this claim requires construction, Icon contends the construction should be:<br><br>"permanently on an inclined axis | "when the support means couples the seat to the bicycle, the abutment means is permanently inclined with respect to the horizontal as viewed from either side of the bicycle to such an extent that that it is not possible for a rider with the backbone arranged generally vertically to sit on the seat |

| without other supports, it is not possible to permanently sit on the [inclined surface/abutment means] with the backbone of the [rider/person] arranged generally vertically" | that crosses the longitudinal axis of the bicycle when the support means couples the seat to the bicycle so that without other supports, it is not possible to permanently sit on the [inclined surface/abutment means] with the backbone of the [person/rider] arranged generally vertically while in a riding position" | permanently without some other support because the rider will simply slip forward on the seat, and therefore the rider is placed in a generally standing position as opposed to a seated position" |

**The Court holds that this term does not require construction.**

The Court finds that when given their ordinary and customary meaning, the words in this claim term are sufficiently clear for a jury to ascertain the scope of the claim, so there is no need for construction. "[C]laim construction is a matter of resolution of disputed meanings and technical scope, to *clarify* and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." O2 Micro, 521 F.3d at 1362 (emphasis added). The goal of claim construction is to instruct the jury on what the meaning of the claimed term is. See Power-One, Inc. v. Artesyn Techs., Inc., 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.") (internal citation omitted). If construing a claim term does not provide further clarity for a jury, it may be appropriate to allow the claim language to speak for itself.

"There is a heavy presumption that claim terms are to be given their ordinary and customary meaning." Aventis Pharms. Inc. v. Amino Chems. Ltd., 715 F.3d 1363, 1373 (Fed. Cir. 2013). "Courts are required therefore to look to the words of the claims themselves to define the scope of the patented invention." Id. (internal citation omitted). Here, the words of the claims themselves define the meaning of the claim term. The abutment means is "permanently transverse with respect to the longitudinal axis of the bicycle when the support means couples the seat to the bicycle." '938 patent col. 6 ll. 53-56, col. 7 ll. 5-8, 44-47, col. 8 ll. 5-8, 27-30, 47-50. The words further make clear that the abutment means is transverse to the extent that without other supports, it is not possible to permanently sit on the abutment means with the backbone of the ride arranged generally vertically. Id. col. 6 ll. 56-58, col. 7 ll. 8-11, 47-50, col. 8 ll. 8-12, 30-33, 50-52.

13

1 On the other hand, neither party's proposed construction provides clarity beyond the plain and ordinary meaning of the term. Instead, these constructions impermissibly read limitations from the specification into the claims. On the one hand, Icon substitutes "transverse with respect to the longitudinal axis" with "on an inclined axis that crosses the longitudinal axis." It is unclear how the abutment means can be "on an inclined axis," and how this inclined axis "crosses the longitudinal axis." Also, while the term "while in a riding position" does not necessarily make the entire limitation a tautology,[4] it is ambiguous. It is unclear what a riding position is. Does it only encompass the position depicted in Fig. 5 of the '938 patent, or does it include all positions in which a rider can ride a bicycle?

On the other hand, Specialized's proposed construction substitutes "longitudinal axis of the bicycle" with "the horizontal as viewed from either side of the bicycle," which is an ambiguous phrase that was viewed by the examiner as a source of indefiniteness. Icon's Opening Brief, Ex. C at 3. Also, it is equally unclear what constitutes a "generally standing position," as opposed to a "seated position." When a rider is on a bicycle with the claimed seat, with most of her weight on the pedals but torso hunched forward, is she standing or seated?

### D. "abutment means" terms — '938 patent claims 1, 15, 11-14

| Terms | Icon's proposed construction | Specialized's proposed construction |
|---|---|---|
| 7. "an inclined surface forming abutment means for receiving a portion of a rider's anatomy which is adjacent to at least | Icon contends that this claim term requires no construction. However, if the Court determines this claim requires construction, Icon contends the construction should be: | The phrase "an inclined surface forming" in these terms needs no construction. The remainder of the claim language in Term Nos. 7-10 is governed by 35 U.S.C. § 112(f). Functions: |

---

[4] Specialized contends: "[U]nder Icon's construction, if a rider's center of gravity is forward of the seat when the rider is leaning forward in a riding position, the limitation is met because the rider will fall forward unless he is supported by handlebars or pedals. Under this construction, the permanently transverse limitation is met by *any* bicycle saddle." Specialized's Responsive Brief at 22 (emphasis added). It is not true that the permanently transverse limitation is met by any bicycle saddle because of the limitation "with the backbone of the [person/rider] arranged generally vertically." When a rider is on a typical bicycle saddle and leans forward when riding, even if she slides forward when she lets go of other supports (such as handlebars), the "permanently transverse" limitation is not met because the rider's backbone is not vertical. If it is vertical, the rider's center of gravity would not be forward of the ischial contact on the seat, and she would not slide forward.

| | | |
|---|---|---|
| one of the rider's ischial bones" (claim 1) | "an inclined surface forming an abutment for receiving a portion of a rider's anatomy which is directly next to at least one of the rider's ischial bones while in a riding position" | 7. "receiving a portion of a rider's anatomy which is adjacent to at least one of the rider's ischial bones"<br>8. "abutting a rider's tissue"<br>9. "receiving substantially only that portion of a person's seating anatomy which covers at least a part of one of the person's ischial bones thereof"<br>10. "receiving a portion of a person's seating anatomy which covers at least a part of one of the person's ischial bones thereof"<br><br>Corresponding structure: "the abutment segments 14 as shown in figs. 1-5 and described at col. 4 ll. 5-12, 20-47, 52-63, and equivalents" |
| 8. "an inclined surface forming abutment means against which a rider's tissue can abut" (claims 5, 11) | Icon contends that this claim term requires no construction. However, if the Court determines this claim requires construction, Icon contends the construction should be:<br><br>"an inclined surface forming an abutment against which a rider's tissue can abut while in a riding position" | |
| 9. "an inclined surface forming abutment means for receiving substantially only that portion of a person's seating anatomy which covers at least a part of one of the person's ischial bones thereof" (claim 12) | Icon contends that this claim term requires no construction. However, if the Court determines this claim requires construction, Icon contends the construction should be:<br><br>"an inclined surface forming an abutment for receiving substantially only that portion of a person's seating anatomy which covers at least a part of one of the person's ischial bones thereof while in a riding position" | |
| 10. "an inclined surface [portion] forming abutment means intended for receiving a portion of a person's seating anatomy which covers at least a part of one of the person's ischial bones | Icon contends that this claim term requires no construction. However, if the Court determines this claim requires construction, Icon contends the construction should be:<br><br>"an inclined surface forming an abutment for receiving a portion of a person's seating anatomy which covers at least one of the person's | |

| thereof" (claims 13, 14) | ischial bones thereof while in a riding position" | |

**The Court adopts Specialized's proposed construction, but describes the corresponding structure as: "as shown in figures 1-5, the abutment segments 14, which are contoured to provide a generally curved profile, matching the contour of the gluteus maximus muscles adjacent a person's ischial bones."**

As a threshold matter, the Court must determine whether the terms are governed by 35 U.S.C. § 112(f). The "use of the word 'means' creates a presumption that the drafter intended to invoke § 112[(f)]." Flo Healthcare Solutions, LLC v. Kappos, 697 F.3d 1367, 1373 (Fed. Cir. 2012).

Here, the claims used the term "means," which raises a rebuttable presumption that the term is subject to § 112(f). However, this presumption is rebuttable. "[W]hen a claim recites a function but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format even if the claim uses the term 'means.'" Id. Thus, as Icon correctly pointed out, this presumption can be overcome by reciting sufficient structure in the claim, even when the patentee incorporated the term "means" during prosecution. TriMed, Inc. v. Stryker Corp., 514 F.3d 1256, 1261 (Fed. Cir. 2008). But here, the presumption is not rebutted. The patentee *expressly* told the Patent Office (and thus the public) that his amendment was intended to put the claims in means-plus-function format. Icon's Opening Brief, Ex. C at 8 (stating in response to an office action "[b]y this amendment, Applicant has amended the claims to recite the structure in 'means-plus-function' terminology so that the structure forming the cycle seat is defined as structure for performing the functional/operational language as now recited in those claims."). Such a statement is analogous to prosecution history disclaimer, where a patentee makes "a clear and unmistakable disavowal of scope during prosecution," removing from the scope what would otherwise fall within. Purdue Pharm. L.P. v. Endo Pharms. Inc., 438 F.3d 1123, 1136 (Fed. Cir. 2006). By clearly and unmistakably telling the public that the amendment was intended to invoke § 112(f) and thus limit the claim scope to the exact structures disclosed in the specification, the patentee has given up any extra scope and cannot reclaim it in claim construction.

Icon cites TriMed, arguing that its reasoning prevents the Court from construing "abutment means" as a means-plus-function term. However, TriMed is distinguishable. In TriMed, the Federal Circuit found that amending a term to recite "means" did not convert the term to means-plus-function format. TriMed, 514 F.3d at 1261. But this holding was based on the patentee's remarks that he *intended* for the structures recited in the claim to be sufficient for accomplishing the claimed functions. Id. Here, the patentee expressly stated an opposite intention during prosecution. Icon's Opening Brief, Ex. C at 8. Also, Icon points to a footnote in TriMed, which states: "A statement that use of means-plus-function language would help overcome prior art does not magically transform language that clearly does not meet our legal tests for § 112[(f)] into means-plus-function language." TriMed, 514 F.3d at 1261. This reasoning, however, does not preclude a construction of "abutment means" as a means-plus-function term. First, a statement that use of means-plus-function language would overcome prior art is not the same as a statement that unequivocally declares a patentee's intention to invoke § 112(f). Second, in the footnote, the Federal Circuit was referring to a statement by the examiner, not the patentee. Id. While a statement by an examiner may be ambiguous as to a patentee's intent, a patentee's express remark can constitute "a clear and unmistakable disavowal of scope during prosecution." See Purdue Pharm., 438 F.3d at 1136. The Court therefore finds Icon's reliance on TriMed unpersuasive.

Having established that the claims at issue are subject to § 112(f), the Court now turns to the construction issues before it. Construction of a means-plus-function limitation requires two steps. "First, the court must identify the claimed function. Second, the court must identify the corresponding structure in the specification that performs the recited function." Chicago Bd. Options Exchange, Inc. v. Int'l Securities Exchange, LLC, 677 F.3d 1361, 1367 (Fed. Cir. 2012) (internal citation omitted). The functions of the abutment means are recited in the claims. For Term Nos. 7-10, their respective functions are: "receiving a portion of a rider's anatomy which is adjacent to at least one of the rider's ischial bones," "abutting a rider's tissue," "receiving substantially only that portion of a person's seating anatomy which covers at least a part of one of the person's ischial bones thereof," and "receiving a portion of a person's seating anatomy which covers at least a part of one of the person's ischial bones thereof."

17

Next, in determining the corresponding structure, "[s]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." Minks v. Polaris Indus., Inc., 546 F.3d 1364, 1377 (Fed. Cir. 2008) (internal citation omitted). Specialized points to the abutment segments 14 as shown in figures 1-5 and described at column 4, lines 5-12 and column 4, lines 20-47 and lines 52-63, which are the exact structure that performs the claimed functions. Icon, on the other hand, proposes a corresponding structure of broader scope, but fails to explain why it is clearly linked or associated with the claimed functions.

**The Court thus adopts Specialized's proposed construction. For the sake of clarity and convenience of the jury, the Court distills the above structure described in the specification as: "as shown in figures 1-5, the abutment segments 14, which are contoured to provide a generally curved profile, matching the contour of the gluteus maximus muscles adjacent a person's ischial bones."**

## IV. CONCLUSION

The Court construes the ten disputed terms as follows:

| Disputed term | Construction |
|---|---|
| 1. "at least one hinge between each of the first and second portions and the front portion for allowing each of the first and second support portions to undergo substantially independent arcuate movement" | "at least one flexible area separating each of the support portions from the front portion to allow flexing to occur between each of the first and second support portions and the front portion so that each of the first and second support portions undergo substantially independent arcuate movement" |
| 2. "a hinge for allowing each of the first and second support portions to undergo substantially independent movement arcuate relative to one another and the nose portion" | "a flexible area separating each of the support portions from the nose portion to allow flexing between each of the support portions and the nose portion so that each of the first and second support portions may undergo substantially independent arcuate movement relative to one another and the nose portion" |

| Disputed term | Construction |
|---|---|
| 3. "a hinge allowing the two separate support portions to undergo substantially independently movement" | "a flexible area separating each of the support portions from the nose portion to allow flexing between each of the support portions and the nose portion so that the two separate support portions may undergo substantially independent movement" |
| 4. "stop means for limiting the amount of movement of the first and second support portions" | Term Nos. 4 and 5 are governed by 35 U.S.C. § 112(f). |
| 5. "stop means is provided for limiting movement of the two support portions" | Functions: 4. "limiting the amount of movement of the first and second support portions"  5. "limiting movement of the two support portions"  Corresponding structure: "as shown in figures 29 and 32-36, the rearwardly extending free end sections 145, which are spaced from the lower surface of the shell 11 and which extend from outwardly extending sections 159, where the sections 159 and 145 may form a continuously curved profile" |
| 6. "permanently transverse with respect to the longitudinal axis of the bicycle when the support means couples the seat to the bicycle so that without other supports, it is not possible to permanently sit on the [inclined surface/abutment means] with the backbone of the [rider/person] arranged generally vertically" | No construction required |

19

| Disputed term | Construction |
|---|---|
| 7. "an inclined surface forming abutment means for receiving a portion of a rider's anatomy which is adjacent to at least one of the rider's ischial bones" (claim 1) | The phrase "an inclined surface forming" in these terms needs no construction. The remainder of the claim language in Term Nos. 7-10 is governed by 35 U.S.C. § 112(f). <br><br> Functions: <br><br> 7. "receiving a portion of a rider's anatomy which is adjacent to at least one of the rider's ischial bones" <br><br> 8. "abutting a rider's tissue" <br><br> 9. "receiving substantially only that portion of a person's seating anatomy which covers at least a part of one of the person's ischial bones thereof" <br><br> 10. "receiving a portion of a person's seating anatomy which covers at least a part of one of the person's ischial bones thereof" <br><br> Corresponding structure: "as shown in figures 1-5, the abutment segments 14, which are contoured to provide a generally curved profile, matching the contour of the gluteus maximus muscles adjacent a person's ischial bones" |
| 8. "an inclined surface forming abutment means against which a rider's tissue can abut" (claims 5, 11) | |
| 9. "an inclined surface forming abutment means for receiving substantially only that portion of a person's seating anatomy which covers at least a part of one of the person's ischial bones thereof" (claim 12) | |
| 10. "an inclined surface [portion] forming abutment means intended for receiving a portion of a person's seating anatomy which covers at least a part of one of the person's ischial bones thereof" (claims 13, 14) | |

**IT IS SO ORDERED.**

Dated: April 16, 2014

_____
JON S. TIGAR
United States District Judge